# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

```
* * * * * * * * * * * * * * * * * * *    *
CHRISTOPHER LOVING             *
and CARLA LOVING,              *     No. 02-469V
parents of CAMILLE LOVING,     *     Special Master Christian J. Moran
                              *
          Petitioners,         *
                              *     Filed: December 15, 2015
     v.                        *
                              *
SECRETARY OF HEALTH            *     Expert costs; reasonableness.
AND HUMAN SERVICES,            *
                              *
          Respondent.          *
                              *
* * * * * * * * * * * * * * * * * * *    *
```

<u>William Dobreff</u>, Dobreff & Dobreff, Clinton Township, MI, for Petitioners;
<u>Darryl R. Wishard</u>, United States Dep't of Justice, Washington, DC, for
Respondent.

## **DECISION AWARDING ATTORNEYS' COSTS[1]**

   In this long-running case, one final issue remains unresolved — the amount
of compensation for the neurologist whom the Lovings retained, Robert M.
Shuman, to serve as their expert.  For Dr. Shuman's services, the Lovings request

---

   [1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17,
2002), requires that the Court post this decision on its website.  Pursuant to Vaccine Rule 18(b),
the parties have 14 days to file a motion proposing redaction of medical information or other
information described in 42 U.S.C. § 300aa-12(d)(4).  Any redactions ordered by the special
master will appear in the document posted on the website.

approximately $284,000.[2]  The Secretary proposes $149,412.53.  I find $189,409.25 reasonable.

## I.    Procedural History

The duration of this case — more than a decade — contributes to the size of the fee request.  Thus, the activities from the filing of the petition to the decision granting the Lovings compensation are set forth in section A below.  This section focuses on the work Dr. Shuman performed as listed on his invoices.

Section B separately discusses the course of the dispute over Dr. Shuman's compensation.  Given the magnitude of the request, the parties have submitted several briefs on this topic.

### A. Merits Case

#### 1.  Beginning of Litigation and Background on Infantile Spasms in the Vaccine Program

On May 9, 2002, the Lovings, acting <u>pro se</u>, filed their petition alleging that a diphtheria-tetanus-acellular pertussis (DTaP) vaccine injured their daughter, Camille.  They alleged that either the second dose of DTaP caused Camille to suffer infantile spasms or the third dose of DTaP significantly aggravated Camille's infantile spasms.  Mr. Dobreff became counsel of record in December 2002.

By 2002, special masters had considered claims that vaccines caused infantile spasms in several cases.  These included:

<u>Fowler v. Sec'y of Health & Human Servs.</u>, No. 91-214V, 1996 WL 512613 (Fed. Cl. Spec. Mstr. Aug. 27, 1996) (crediting the Secretary's argument that infantile spasms naturally progress over time and any worsening in infantile

---

[2] The Lovings now seek an award of fees and costs for their expert, Dr. Shuman, totaling $284,203.07, which includes reimbursement of $4,800.00 the Lovings paid out-of-pocket to Dr. Shuman.  Pet. for Fees and Costs, filed Feb. 19, 2014, at 2-3.

spasms shortly after vaccination did not constitute a significant aggravation of infantile spasms);

Jenkins v. Sec'y of Health & Human Servs., No. 90-371V, 1999 WL 476255 (Fed. Cl. Spec. Mstr. June 23, 1999) (relying upon the 1991 report from the Institute of Medicine to find that a diphtheria-pertussis-tetanus (DPT) vaccine did not cause infantile spasms); and

Raj v. Sec'y of Health & Human Servs., No. 96-294V, 2001 WL 963984 (Fed. Cl. Spec. Mstr. July 31, 2001) (finding that infantile spasms, which first appeared within 72 hours of a DPT vaccination, did not qualify as an encephalopathy as defined in the revised table, and finding that petitioners failed to establish that the vaccination was the cause-in-fact of the infantile spasms).

In short, after the Secretary removed seizures from the Vaccine Injury Table, very few petitioners whose child suffered from infantile spasms received compensation. This background helps explain in part why Dr. Shuman spent so many hours on this case.

### 2. Retention of Dr. Shuman and Submission of his First and Second Reports

Approximately three years after Mr. Dobreff became counsel of record, the Lovings filed a report from Dr. Shuman on December 23, 2005. After the then-presiding special master requested additional information about the basis for Dr. Shuman's opinions (order, issued Dec. 23, 2005), the Lovings filed a supplemental report on January 18, 2006.[3]

Dr. Shuman's first report, which is dated October 17, 2005, is 20 pages. The first 17 pages are devoted to summarizing Camille's medical records. Dr. Shuman's opinion is contained in the subsequent three pages. Dr. Shuman cited four articles in support of his opinion.

_____

[3] Mr. Dobreff did not assign exhibit numbers to Dr. Shuman's report filed on December 23, 2005, or to Dr. Shuman's report filed on January 18, 2006.

Dr. Shuman's January 18, 2006 report was one page. Dr. Shuman handwrote answers to two questions and added that "It is my opinion, to a reasonable degree of medical certainty, that the third DTaP vaccination aggravated a pre-existing seizure disorder or encephalopathy." Dr. Shuman did not include any time for preparing his January 18, 2006 report on his invoice.

From his initial retention through the submission of his first report, Dr. Shuman presented two invoices, dated February 25, 2005 and October 17, 2005. Shuman Invoice at 1.[4] The first invoice contains five entries. The first entry is for six hours of "review." Dr. Shuman did not identify what was being reviewed. In the third entry, the task is "Transcript" for 3.5 hours. However, to my knowledge, there was no transcript at this point. The fourth and fifth entries for 2.83 hours and 3.33 hours contain no information in the "task" column.

On February 27, 2005, Mr. Dobreff spent 0.15 hours reviewing Dr. Shuman's bill. Dobreff Timesheet. There is no notation as to whether Mr. Dobreff noted any irregularities regarding Dr. Shuman's bill at this time.

The second invoice, dated October 17, 2005, contains nine entries. For two entries, Dr. Shuman stated that he spent 6 hours and 7 hours "review[ing] books." From the context, these books are two publications from the Institute of Medicine. On October 19, 2005, Mr. Dobreff again spent 0.15 hours reviewing the bill from Dr. Shuman.

For his work through October 16, 2005, Dr. Shuman invoiced nearly 57 hours of work, valued at $19,936.00. Dr. Shuman's costs for this time were $93.00.

### 3. Bibliography

Despite Dr. Shuman's efforts, the Secretary continued to maintain that the Lovings were not entitled to compensation. Resp't's Rep., filed Feb. 27, 2006.

---

[4] "Shuman Invoice" refers to exhibit 36, filed February 19, 2014. Similarly, "Dobreff Timesheet", infra, refers to exhibit 1, also filed February 19, 2014.

The Secretary relied upon Dr. Michael Kohrman, who traded reports with Dr. Shuman throughout the litigation.  Exhibit C.

The parties began to plan for a hearing.  As part of that process, the Lovings were ordered to file the articles on which Dr. Shuman relied.  Orders, issued March 7, 2006 and May 9, 2006.  In a letter to Mr. Dobreff dated June 13, 2006, Dr. Shuman supplied a bibliography, listing more than 50 articles.  Exhibit 33.  But this bibliography does not contain any description of why any particular article is relevant.  Mr. Dobreff filed the bibliography and the medical articles listed therein on June 26, 2006.  Exhibits 33-89.

For his work from May 3, 2006 through June 13, 2006, Dr. Shuman has requested compensation for 31.9 hours.  Shuman Invoice at 1-2.  He separately charged for 10 hours of work his staff performed.  Id. at 1.  The total for these services is $11,415.00.  Id. at 1-2.  Dr. Shuman's costs for this time were $31.61.

### 4.  Testimony at First Hearing

After the Lovings filed the articles, which total more than 800 pages, a status conference was held.  The Secretary requested that Dr. Shuman supply an explanation of the articles' relevance and the Lovings agreed.  A preliminary review suggested some articles may not be relevant because they discussed different conditions and/or different vaccines.  Order, issued July 7, 2006.

In response, the Lovings filed an "annotation" from Dr. Shuman on October 16, 2006.  The annotation is based upon the June 13, 2006 letter from Dr. Shuman to Mr. Dobreff.  To that letter (exhibit 33), Dr. Shuman added a one-sentence description of each article.  Exhibit 90.

Within 10 days of the anticipated start of the hearing, the Lovings filed additional material.  Exhibits 91-95, filed November 8, 2006, are additional articles, and exhibits 96-100, filed November 16, 2006, are additional medical records.

Once Dr. Shuman began to testify on November 17, 2006, it was readily evident that he had not disclosed his opinions in his reports.  Tr. 109-10, 113-14.  Thus, Dr. Shuman was going to prepare additional reports.  Tr. 184-87.  The Secretary also presented some testimony from Dr. Kohrman.  Tr. 236-69.

For his work from July 20, 2006 through December 31, 2006, Dr. Shuman has requested compensation for 154.65 hours, valued at $54,127.50.  Dr. Shuman did not bill costs for this time period.

## 5.  Supplemental Report

Following the first session of the hearing, the Lovings were ordered to file a supplemental report from Dr. Shuman.  The Lovings did so on March 12, 2007.  Exhibit 101.  The Secretary filed supplemental reports from Dr. Kohrman.  Exhibits H and J.

Dr. Shuman's written work product is a 23-page report, dated February 21, 2007.  Although some of the pages contain significant white space (and page five is blank), this report is written in a small font with narrow margins.  The report includes a detailed analysis of several articles.  Dr. Shuman also cited 15 articles, which were filed as exhibits 102-16.

For this period, starting on January 6, 2007, and ending on March 31, 2007, Dr. Shuman charged 202.67 hours.  The value of this work is $71,992.85.  Dr. Shuman's costs for this time were $1,058.35.

## 6.  Second Session of the Hearing

With this record, another hearing was held on November 26-27, 2007, approximately one year after the first hearing.  During the second session, both Dr. Shuman and Dr. Kohrman completed their oral testimony.

Between November 2, 2007 and December 28, 2007, Dr. Shuman has invoiced 198.29 hours.  The value of this work is $70,571.66.  Dr. Shuman's costs for this time were $49.22.

## 7.  Decision and Order on Motion for Review

After submission of post-trial briefs, a decision denying compensation was issued.  Decision, 2008 WL 4692376 (Fed. Cl. Spec. Mstr. Oct. 6, 2008).  The Lovings filed a motion for review with the Court of Federal Claims.  The Court of Federal Claims vacated the October 6, 2008 decision and remanded for additional proceedings.  Opinion and Order, 86 Fed. Cl. 135 (2009).

### 8. Activities on Remand, including Additional Report from Dr. Shuman

On remand, the undersigned determined that the Lovings had established that Camille's condition was worse after receiving the third dose of DTaP, and gave the parties an opportunity to develop evidence "to distinguish problems that the DTaP vaccination caused from problems that Camille would have experienced due to her pre-existing infantile spasms.  When this process concludes, another decision will issue."  Ruling, 2009 WL 3094883 (Fed. Cl. Spec. Mstr. July 30, 2009).

The Lovings filed a motion for reconsideration or clarification of the undersigned's July 30, 2009 ruling.  See Pet'rs' Mot., filed Oct. 6, 2009.  The undersigned granted only the Lovings' motion for clarification and revised the language of his ruling.  Ruling, 2010 WL 1076124 (Fed. Cl. Spec. Mstr. Mar. 2, 2010).  After the March 2, 2010 order addressing reconsideration, the parties attempted to resolve the case.  The parties then each retained a life care planner and began preparing life care plans.

As part of the process of determining the extent of injury suffered by Camille, the Lovings required additional assistance from Dr. Shuman.  The Lovings filed, on December 20, 2010, an additional supplemental report from Dr. Shuman.  Exhibit 155.  The Secretary filed a responsive report from Dr. Kohrman on April 22, 2011.  Exhibit T.

For the period April 9, 2009 to September 10, 2010, Dr. Shuman has requested compensation for 152.78 hours.  The value of this work is $53,562.85.  Dr. Shuman's costs for this time were $89.85.

### 9. Resolution of the Petition

After the submission of Dr. Kohrman's April 22, 2011 report, proceedings slowed dramatically.  The undersigned repeatedly ordered petitioners to file status reports and information requested by the Secretary for the furtherance of settlement discussions.  See generally, orders, issued Sept. 28, 2011; Dec. 22, 2011; Apr. 16, 2012; Aug. 24, 2012.  The parties sought alternative dispute resolution ("ADR") in early 2013, and requested a 15-week stipulation order on May 7, 2013.  On September 18, 2013, the parties filed a joint stipulation for award.  The undersigned awarded the compensation set forth therein.  The Lovings received

$400,000.00, and the Secretary was ordered to spend $850,000.00 to purchase an annuity for Camille's benefit.  Decision, 2013 WL 5631494 (Fed. Cl. Spec. Mstr. Sept. 20, 2013).

In this time, Dr. Shuman performed a single task.  On February 28, 2013, Dr. Shuman wrote a letter.  This task took 1.5 hours and the value is $525.00.  Dr. Shuman billed no costs for this time period.

### 10. Dr. Shuman's Total Bill

The values listed above for hourly work are $19,936.00, $11,415.00, $54,127.50, $71,992.85, $70,571.66, $53,562.85, and $525.00.  The total amount of those values is $282,130.86.  The total for Dr. Shuman's costs is $1,322.03.

### B. Attorneys' Fees and Costs

Because petitioners received compensation in the September 20, 2013 decision, they are entitled to an award of reasonable attorneys' fees and costs.  42 U.S.C. § 300aa-15(e).  The Lovings filed their motion for attorneys' fees and costs on February 19, 2014.  The Lovings submitted more than 50 exhibits, totaling more than 200 pages.  Pet. for Fees and Costs, filed Feb. 19, 2014.  Of these exhibits, the ones primarily relevant to this decision are Dr. Shuman's invoices, expenses, and affidavit.  Fee exhibits 36 ("Shuman Invoice"), 37, 38 (filed Feb. 19, 2014).[5]

The motion requested a relatively high amount of attorneys' fees and an extremely high amount of costs relating to Dr. Shuman.  After discussions between the attorneys, the Lovings agreed to reduce the amount sought in attorneys' fees and costs not related to Dr. Shuman and the Secretary agreed not to object to the compromised amount.  The parties did not reconcile their differences regarding Dr. Shuman.

---

[5] Many of the exhibits document costs that either Mr. Dobreff or the Lovings incurred, such as charges while traveling.  Although many attorneys collect these documents as one exhibit with continuous pagination, Mr. Dobreff's submission as separate exhibits is also a reasonable presentation.

The Secretary memorialized her objections to the charges for Dr. Shuman's work, identifying several challenges to aspects of Dr. Shuman's invoice. These objections include: (1) entries for which Dr. Shuman did not identify any task, (2) entries for which the task is described too vaguely to assess the reasonableness of the work, (3) entries for which Dr. Shuman performed excessive and repetitive work, and (4) entries in which Dr. Shuman performed administrative tasks. Resp't's Resp., filed July 16, 2014, at 5-6. The Secretary did not propose a specific amount of compensation that she viewed as reasonable. Instead, the Secretary requested that the special master award "an appropriate amount of compensation." Id. at 7.

After reviewing the submissions, the undersigned recognized that the dispute involving Dr. Shuman would probably take time to resolve. Thus, the undersigned held a status conference on September 2, 2014.

In that status conference, the parties expressed an interest in seeking mediation to resolve the expert fees and costs. The undersigned also recommended an interim award of the undisputed amount of attorneys' fees and costs. The Secretary did not object to the recommendation.

The undersigned awarded the Lovings the undisputed interim attorneys' fees and costs. Interim Fees Decision, 2014 WL 10558839 (Fed. Cl. Spec. Mstr. Sept. 10, 2014). Additionally, on the same day, an order referred the disputed expert fees and costs to ADR with Special Master Corcoran. Order, issued Sept. 10, 2014.

Special Master Corcoran conducted a telephonic ADR status conference on September 22, 2014. The parties were unable to come to an agreement through the mediation. Therefore, Special Master Corcoran removed the case from the ADR process. Order, issued Oct. 7, 2014.

Following the ADR status conferences, both parties requested an opportunity to elaborate on their positions. The Secretary filed a supplemental brief on October 17, 2014, stating the basis of her objections to petitioners' request for $284,203.07 in expert fees and costs. Although the Secretary continued to accept the proposed hourly rate as reasonable, the Secretary did not accept the 811 hours that Dr. Shuman billed. Resp't's Suppl. Br., filed Oct. 17, 2014, at 1-2. The Secretary asserted that, when determining the "reasonableness" of expert costs, the request should be evaluated based on what a hypothetical client would be willing

to pay, and under this test, the client would not pay for all the work done by Dr. Shuman.  Id. at 2.

With respect to the number of hours, the Secretary made essentially two arguments.  First, the Secretary compared Dr. Shuman's work to other cases in the Vaccine Program that have involved relatively large requests for expert fees.  Second, the Secretary compared Dr. Shuman's work in the present case to other cases in which Dr. Shuman participated.

Compared to all other cases in the Vaccine Program, the Secretary asserted that she believed that Dr. Shuman's request constituted "the largest number of hours sought by an expert in any case in Program history."  Id. at 3.  In terms of dollars, the Secretary stated that the only comparable requests came from the Omnibus Autism Proceeding (OAP).  In that proceeding, the petitioners requested that the Geiers receive more than $350,000, but were actually compensated for only approximately $33,000.  King v. Sec'y of Health & Human Servs., No. 03-584V, 2010 WL 5470787, at *23 (Fed. Cl. Spec. Mstr. Dec. 13, 2010) (decision awarding $33,130.35 in consultant fees out of a requested $364,596.05, a 91% reduction).  In addition, Dr. Aposhian requested approximately $250,000, although the precise amount of compensation he received is not known.  King v. Sec'y of Health & Human Servs, No. 03-584V, 2009 WL 2252534, at *5 n.9 (Fed. Cl. Spec. Mstr. July 10, 2009).  The Secretary distinguishes the present case from the OAP because the OAP involved a three-week trial and potentially affected more than 5,000 cases.

The Secretary appeared to suggest that a more suitable basis for comparison was two cases involving a single injured party with relatively extensive hearings.  In this context, the Secretary cited an infantile spasm case in which a motion for review was filed.  Taylor v. Sec'y of Health & Human Servs., No. 05-1133V, 2012 WL 4829293 (Fed. Cl. Spec. Mstr. Sept. 20, 2012), mot. for review denied, 108 Fed. Cl. 807 (2013).  In Taylor, the total amount of attorneys' fees and costs was $98,278.25.  Taylor v. Sec'y of Health & Human Servs., No. 05-1133V, 2013 WL 5429161 (Fed. Cl. Spec. Mstr. Sept. 4, 2013).

The other case the Secretary cited was a case in which Dr. Kinsbourne authored four reports and attended two hearings.  The special master compensated Dr. Kinsbourne for 125 hours, worth $34,455.00.  Stone v. Sec'y of Health & Human Servs., No. 04-1041V, 2010 WL 3790297, at *7-8 (Fed. Cl. Spec. Mstr. Sept. 9, 2010).

10

The Secretary also compared the present fee request with the fees billed by Dr. Shuman in previous vaccine cases.  Resp't's Suppl. Br., filed Oct. 17, 2014, at 5.  In some cases, Dr. Shuman billed less than a quarter of the hours he is currently seeking, due in part to writing fewer reports and participating in fewer days of hearing than in the present case, and was awarded reduced amounts.  Id. (citing Kuperus v. Sec'y of Health & Human Servs., No. 01-60V, 2006 WL 3499516 (Fed. Cl. Spec. Mstr. Nov. 17, 2006) (expert fee reduced by six hours to $66,050.34); Nuttall v. Sec'y of Health & Human Servs, No. 07-810V, 2014 WL 643584 (Fed. Cl. Spec. Mstr. Jan 23, 2014) (expert fee reduced by 5 percent to $63,494.20)).  In light of Dr. Shuman's previous billing, the Secretary characterized his current request as "shockingly excessive and completely unreasonable."  Id. at 6.

The Secretary concluded that a reasonable amount of compensation for Dr. Shuman's work "is no more than $80,000."  Id. at 7.  The Secretary primarily relied upon Dr. Shuman's billing in Kuperus.

On November 5, 2014, petitioners filed a response to the Secretary's objections, including another set of exhibits, again labeled 1 through 10.[6]  The Lovings emphasized that this case resulted in the largest compensation for an infantile spasms case, which should reasonably result in a client compensating their expert for the amount requested.  The Lovings were quick to challenge the Secretary's argument that a reasonable client would not pay Dr. Shuman's fee, stating that, in fact, any client would be happy to pay in light of the award received.  Pet'rs' Resp., filed Nov. 5, 2014, at 1-2.

A significant portion of the Lovings' response recited the procedural aspects of the case and/or listed topics that Dr. Shuman addressed.  Id. at 2 (discussing Court's Opinion and Order), 7-19.[7]  Much (if not all) of this presentation was not

---

[6] Of these November 5, 2014 exhibits, the only meaningful one is exhibit 10, a second affidavit from Dr. Shuman.  This affidavit updates Dr. Shuman's previous affidavit, exhibit 38, which petitioners filed on February 19, 2014.  This decision refers to the November 5, 2014 exhibit 10 as the "Shuman Affidavit."

[7] In this context, the Lovings assert that "Dr. Shuman's expert testimony provided the basis for the Petitioners to win on appeal in the Federal Circuit."  Id. at 17.  Although Dr.

(…continued)

helpful as the undersigned was familiar with the litigation and had reviewed Dr. Shuman's invoices describing his work.

The Lovings did not answer many of the objections raised in the Secretary's July 17, 2014 response.  For example, although the Secretary identified entries for which Dr. Shuman had charged time but not listed any task, the Lovings did not obtain supplemental information to fill this gap.[8]

Regardless, the Lovings directly addressed some of the Secretary's October 17, 2014 arguments.  The Lovings differentiated their case from Taylor, the Secretary's example of fees and costs awarded in another infantile spasm case.  In Taylor, the petitioner was not awarded compensation due in part to the expert failing to provide a reliable theory causally linking the vaccine to the injury.  The Lovings claimed that Taylor illustrates the "extreme scrutiny" of expert testimony in the Program, especially in infantile spasm cases, necessitating a "complete and detailed understanding of the scientific literature."  Pet'rs' Resp., filed Nov. 5, 2014, at 4.

With respect to Stone, the Lovings maintained that Dr. Shuman's bill should not be reduced for the reasons that Dr. Kinsbourne's bill was reduced.  For example, the special master in Stone discounted Dr. Kinsbourne for his lack of knowledge about genetics.  Id. at 5.

---

Shuman's opinion was crucial to the outcome of the motion for review, a judge at the Court of Federal Claims, not the Federal Circuit, resolved the motion for review.  In addition, although the petitioners succeeded on their motion for review because the October 6, 2008 decision denying compensation was vacated, the Court did not determine that the Lovings were entitled to compensation.  Opinion and Order, 86 Fed. Cl. at 152.

[8] The Lovings asserted that "Respondent did not object to lack of specificity in Dr. Shuman's billing or any block billing.  There was no suggestion by Respondent's experts that it was unreasonable or unnecessary to review and analyze an article relied on by Dr. Shuman in Respondent's review."  Pet'rs' Resp. at 5.

This statement is accurate only if the source of the Secretary's objections is restricted to the October 17, 2014 brief.  In the earlier response, the Secretary argued that Dr. Shuman's invoice was vague and the time he spent reviewing articles was excessive.  Resp't's Resp., filed July 14, 2014, at 5-6.

The Lovings also addressed two previous cases involving Dr. Shuman, Nuttall and Kuperus.  They characterize the reductions in Dr. Shuman's charges (either 5 or 6 percent) as "minimal."  Id. at 5-7.

Once the undersigned again took up the matter after these briefs, the undersigned requested additional information from the Lovings to explain the work that Dr. Shuman performed.  Order, filed June 24, 2015.

On July 15, 2015, the Lovings filed a status report that did not provide much helpful information.  In addition, the Lovings filed another set of exhibits, which largely confused the state of the record because the Lovings cited to the exhibits appended to the status report, rather than the exhibits filed during the merits phase.[9]

I ordered the Lovings to file an electronic version of a spreadsheet that reproduced Dr. Shuman's invoice in a series of rows and columns.  See order, issued July 27, 2015.  The Lovings filed this spreadsheet on August 6, 2015.  Pet'rs' Status Rep., filed Aug. 6, 2015, Electronic Spreadsheet.[10]  This spreadsheet has been indispensable to analyzing the Lovings' claim.[11]

After I received the Lovings' spreadsheet, I ordered the Secretary to analyze Dr. Shuman's work on a line-by-line basis.  Order, issued Sept. 4, 2015.

As instructed, the Secretary added columns to the spreadsheet.  For each of Dr. Shuman's entries, the Secretary generally took one of two approaches.  The Secretary accepted some hours as reasonable, and disagreed with other hours as

---

[9] For example, during the merits phase of the case, the Lovings filed Dr. Shuman's annotation to his bibliography as exhibit 90.  The Lovings reproduced this annotation as exhibit 7 to the July 15, 2015 status report.

[10] "Electronic Spreadsheet" refers to the electronic version of the Excel spreadsheet filed on August 6, 2015.

[11] The automatic calculations in Excel corrected various computational errors in petitioners' original submissions.  Figures in this decision derive from the Electronic Spreadsheet.

13

excessive or redundant.  <u>E.g.</u> entry for Oct. 2, 2005.  Alternatively, the Secretary did not comment on the entry, making no objection.  <u>E.g.</u> entry for Nov. 26, 2004.

The value of the entries that the Secretary explicitly accepted as reasonable total $106,850.00.  The value of the entries for which the Secretary interposed no objection total $41,250.50 plus another $1,322.03 for Dr. Shuman's costs.  The sum of these three items is $149,412.53.  The amount for which there is an explicit dispute is therefore $132,718.33.[12]

## II.    Standards for Adjudicating Applications for Expert Fees[13]

The Vaccine Act authorizes special masters to award only "reasonable" attorneys' fees.  42 U.S.C. § 300aa–15(e)(1).  Likewise, expert fees must be "reasonable."  <u>Perreira v. Sec'y of Health & Human Servs.</u>, 27 Fed. Cl. 29, 34 (1992), <u>aff'd</u>, 33 F.3d 1375 (Fed. Cir. 1994).

To determine the reasonableness of a request for attorneys' fees, a lodestar analysis in which a reasonable hourly rate is multiplied by a reasonable number of hours is used.[14]  <u>See</u> <u>Avera v. Sec'y of Health & Human Servs.</u>, 515 F.3d 1343, 1348 (Fed. Cir. 2008); <u>Saxton v. Sec'y of Health & Human Servs.</u>, 3 F.3d 1517, 1521 (Fed. Cir. 1993).  The same lodestar analysis is used for expert services.  <u>Guy v. Sec'y of Health & Human Servs.</u>, 38 Fed. Cl. 403, 407 (1997); <u>Simon v. Sec'y of Health & Human Servs.</u>, No. 05-941V, 2008 WL 623833, at *1 (Fed. Cl. Spec. Mstr. Feb. 21, 2008).

---

[12] $282,130.86 - $149,412.53 = $132,718.33, where $282,130.86 is calculated in section I.A.10 of this opinion.

[13] This section cites many cases decided before 2002 because these older authorities notified the Lovings, their attorney, and Dr. Shuman about the expectations for an invoice from an expert before Dr. Shuman prepared his invoice here.

[14] The Secretary does not contest the reasonableness of Dr. Shuman's hourly rate of $350.00.  Resp't's Resp., filed July 17, 2014, at 4; Resp't's Suppl. Br., filed Oct. 17, 2014, at 1.

Petitioners bear the burden of monitoring their expert's billing to avoid fees that are excessive or redundant in context of the issues being litigated.  Caves v. Sec'y of Health & Human Servs., 111 Fed. Cl. 774, 779 (2013) ("an expert's billed costs should be reduced from the amount requested when the expert's billed hours are excessive") (citing Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)); Riggins v. Sec'y of Health & Human Servs., No. 99-382V, 2009 WL 3319818, at *5 (Fed. Cl. Spec. Mstr. June 15, 2009), mot. for review denied, slip. op. (Dec. 10, 2009), aff'd, 406 Fed. Appx. 479 (Fed. Cir. 2011); Perreira v. Sec'y of Health & Human Servs., No. 90-847V, 1992 WL 164436, at *4 (Fed. Cl. Spec. Mstr. June 12, 1992) ("This court has continuously warned counsel of their obligation to monitor expert fees."), mot. for review denied, 27 Fed. Cl. 29 (1992), aff'd, 33 F.3d 1375 (Fed. Cir. 1994). This monitoring burden includes ensuring that experts invoice their work contemporaneously and with enough description to allow for a reasonableness assessment of their work.  Caves, 111 Fed. Cl. at 780; Wasson v. Sec'y of Health & Human Servs., No. 90-208V, 1991 WL 135015, at *3 (Fed. Cl. Spec. Mstr. July 5, 1991) ("The question is not whether [the expert] expended the number of hours claimed, but whether it was necessary or reasonable for him to do so."), aff'd after remand, 988 F.2d 131 (Fed. Cir. 1993).

Petitioners have the burden of providing support for the reasonableness of their expert fee application.  Sabella v. Sec'y of Health & Human Servs., 86 Fed. Cl. 201, 223 (2009) (finding no abuse of discretion by special master when determining typical hours for tasks performed by expert "[w]here petitioner has failed to provide adequate documentation to support the costs petitioner claimed"); Wilcox v. Sec'y of Health & Human Servs., No. 90-991V, 1997 WL 101572, at *4 (Fed. Cl. Spec. Mstr. Feb. 14, 1997) ("petitioners must substantiate the hourly rates claimed by their experts and the number of hours spent in providing services").

In November 2004, the Office of Special Masters issued revised Guidelines.[15]  The Guidelines state "counsel are advised to maintain detailed contemporaneous records of time and funds expended under the Program."  Office of Special Masters, Guidelines for Practice under the National Vaccine Injury

---

[15] In November 2004, Dr. Shuman performed three tasks with a value of $3,500.00.  The remainder of his activities occurred after the Guidelines were issued.

Compensation Program (Rev. Nov. 2004) at § XIV [hereinafter Guidelines].  The Guidelines further provided: "Each task should have its own line entry indicating the amount of time spent on the task.  Several tasks lumped together with one time entry frustrates the court's ability to assess the reasonableness of the request."  Id. at § XIV.A.3.  Special masters may look to the Guidelines in assessing an expert's invoice.  Caves, 111 Fed. Cl. at 780-81 (finding special master was not arbitrary in reducing award to expert because invoice did not explain what tasks were performed); Savin v. Sec'y of Health & Human Servs., 85 Fed. Cl. 313, 316 (2008).  Special masters have awarded reduced costs where an expert's invoice was not contemporaneously created or lacked sufficient detail for a reasonableness determination.  See Caves, 111 Fed. Cl. 774; Morse v. Sec'y of Health & Human Servs., 89 Fed. Cl. 683 (2009).

A special master is not required to accept at face value any bill the petitioner presents.  "A special master is permitted and even expected to examine a law firm's time sheets and root out hours that are excessive, redundant, or otherwise unnecessary so that they may be excluded from an award."  Davis v. Sec'y of Health & Human Servs., 105 Fed. Cl. 627, 637-38 (2012) (internal quotation marks omitted) (quoting Carrington v. Sec'y of Health & Human Servs., 85 Fed. Cl. 319, 323 (2008)).  Similarly, special masters are not required to assess fee petitions on a line-by-line basis.  See Saxton, 3 F.3d at 1521 (approving special master's elimination of 50 percent of the hours claimed).

## III.   Analysis

The parties do not dispute one component of the lodestar formula, which is a reasonable hourly rate.  The Lovings propose compensating Dr. Shuman at a rate of $350.00 per hour, and the Secretary does not object to that rate for work requiring Dr. Shuman's expertise.  The undersigned also finds that rate reasonable given the case's circumstances.

Thus, the disputed issue is the reasonable number of hours.  The analysis of the reasonableness of Dr. Shuman's work starts with his invoice, which describes his tasks.  As discussed in section A below, the invoice contains multiple deficiencies.  Despite the significant impediments to understanding the nature of Dr. Shuman's work, I assess the reasonableness of his claim in section B.  Finally, in section C, I compare Dr. Shuman's award in this case to awards in other cases.

## A. Dr. Shuman's Invoice

By the time Dr. Shuman began working on this case, special masters had issued several decisions explaining their expectations about the content of an expert's invoice. Measured against these standards, Dr. Shuman's invoice falls short in several respects. These problems fall into the following categories: "lumping" work performed into poorly detailed line item descriptions, redundant work, and administrative tasks.

### 1. Poor Item Descriptions

Dr. Shuman's initial invoice contained billings for which no description is given. On the first page alone, Dr. Shuman billed for more than $8,000 without explaining what he did. Shuman Invoice, items dated 2/9/05, 2/12/05, 6/4/06, 6/12/06, and 6/13/06. While the number of entries that lack any description is not large in an absolute sense, the submission of an invoice including any entries without this basic, expected information raises questions. Specifically, there are questions about the invoicing practices of both Dr. Shuman and the Lovings' attorney, as well as the compensability of the work billed in accordance with these practices.

The Secretary raised the lack of notation in her first brief regarding Dr. Shuman's invoice. Resp't's Resp., filed July 16, 2014, at 5-6. Nonetheless, the Lovings did not correct this omission in subsequent filings. When the undersigned discussed the pending fee request in a status conference, the undersigned stated that he did not understand the nature of Dr. Shuman's work for the entries in which he did not describe any task. See order, issued July 27, 2015. Thereafter, the Lovings filed the spreadsheet presenting information to explain what Dr. Shuman did.

While the omission of any task description is the most extreme problem with Dr. Shuman's initial invoice, there are additional problems as well. Many of the descriptions are vague.

For example, on his initial invoice, Dr. Shuman listed medical articles and associated many hours with one article or a few articles. For example, on July 20, 2006, Dr. Shuman spent 9.15 hours on "Outline Swaiman." Mr. Dobreff, subsequently, confirmed that Swaiman refers to exhibit K. Exhibit K is the relevant chapter from Dr. Swaiman's textbook on neurology. Tallie Z. Baram,

<u>Myoclonus, Myoclonic Seizures, and Infantile Spasms</u>, in 1 Pediatric Neurology Principles & Practice 1065, 1065-70 (Kenneth F. Swaiman et al. eds., 4th ed. 2006).  The exhibit itself is only six substantive pages.  For Dr. Shuman to have spent 9.15 hours reviewing one six-page article, he would have spent approximately 90 minutes per page.  Without knowing more about what Dr. Shuman's "outline" entailed, it is difficult to accept that more than nine hours (the equivalent of an entire workday, at a cost of $3,202.50) is a reasonable amount of time for outlining one six-page article.

Another example concerns Dr. Shuman's review of two reports from the Institute of Medicine.  On October 2 and 9, 2005, Dr. Shuman listed 6 hours and 7 hours "review[ing] books", without any further description.  Mr. Dobreff, subsequently, confirmed that the books were chapters from the IOM.[16]  Electronic Spreadsheet.  In his affidavit, Dr. Shuman clarified that his use of the term "rev" in his invoice indicated "review, analyze, and critique" of listed publications.  Shuman Affidavit at 6, ¶ 46.

This elaboration does not reasonably explain what Dr. Shuman did for approximately one and a half days.  The Secretary asserted that: "Given Dr. Shuman's expertise generally and his experience providing testimony in Program cases, it is reasonable to expect that Dr. Shuman was already familiar with these publications and would not have needed to devote so much time to their reviews."  Resp't's Resp., filed July 16, 2014, at 6.  The Lovings did not provide any information about Dr. Shuman's prior review of the IOM reports.

If the possibility that Dr. Shuman previously reviewed the IOM reports is set aside, there remain questions about what Dr. Shuman did for the 13 hours he said he spent reviewing, analyzing, and critiquing the IOM reports.  The IOM reports appear to be written for an audience that is not trained in medical science.  They should be readily understandable to someone with years of experience in neurology, like Dr. Shuman.  Thus, without more information from Dr. Shuman, the 13 hours appear excessive.

---

[16] Mr. Dobreff listed exhibits 54, 55, 83, and 84.

Another dimension of the overall problem of poor descriptions is Dr. Shuman's tendency to lump many articles together in one entry. The Vaccine Guidelines clearly warn against listing too many activities in one entry, because such block billing makes assessing the reasonableness of the time claimed difficult or impossible. Guidelines at § XIV.A.3.

Two examples of problems with the item descriptions occurred on January 10 and 11, 2007. See Shuman Invoice, items dated 1/10/07 and 1/11/07. These entries are:

> For January 10, 2007: "0914h-1657h (+see TC below) Niedermeyer's 6th Ed; Ford's text; 1988 London Law articles 2058h-2128h TC G.Bigelow UofM library"

> For January 11, 2007: "0941h-1335h+l407h-1603h Am Acad Peds CID1990; Marcuse 1989; Ford Sz with Repeat DPT; Marcuse 1989; graph; TC Dobreff; TC GBigelow"

After Mr. Dobreff was asked to clarify Dr. Shuman's invoice, the Lovings stated that the corresponding evidence is exhibit 49. This is the indication for both the January 10, 2007 entry and the January 11, 2007 entry. Electronic Spreadsheet.

Exhibit 49 is, in fact, an excerpt of the 5th edition of Diseases of the Nervous System in Infancy, Childhood and Adolescence by Frank R. Ford. Although the Lovings did not include publishing information in their submission, it appears that this edition was published in 1967.[17] Internal pages 555-68 are devoted to cases of disseminated encephalomyelitis after measles virus (not vaccine). Dr. Shuman made many notes throughout these 14 pages. Internal pages 570-73 discuss encephalomyelitis after vaccination against variola. Dr. Shuman has again made notes throughout these four pages. Of more direct relevance to this case are internal pages 589-93, discussing pertussis encephalopathy. Exhibit 49 at 619-31, 634-37, and 653-57. For the remainder of the chapter, internal pages 593-

---

[17] See Melvin D. Yahr, Diseases of the Nervous System in Infancy, Childhood and Adolescence ed 5, JAMA Neurology (Nov. 19, 2015, 9:57 AM), http://archneur.jamanetwork.com/article.aspx?articleid=567258.

628, there are no notations.  Finally, there is an excerpt from a different chapter (internal pages 800-06), where there are more annotations.  Id. at 694-98.  Thus, Dr. Shuman's notations are largely confined to approximately 28 pages.  How much time is reasonable for an analysis of this much material?

Dr. Shuman's time on January 10 and 11, 2007, totals slightly more than 14 hours.  How much time was devoted to Ford is not clear because Dr. Shuman's invoice does not separate the Ford chapter from other materials.  Dr. Shuman listed other articles, including Niedermeyer's 6th ed., 1988 London law articles, Am Acad Peds 1990, Marcuse, and graph.  However, when given an opportunity, Mr. Dobreff did not associate any of these articles with corresponding evidence.

## 2.  Redundant Research Work

The deficiencies in specifying the nature of the work lead to a related concern:  redundant research work.  Dr. Shuman's invoice repeats articles.

For example, in his March 31, 2007 invoice, the 1994 IOM report, which was filed as exhibits 83 and 84, is included in block entries exceeding 30 hours.  Shuman Invoice, items dated 1/6/07, 1/8/07, 1/9/07, and 1/15/07.  Dr. Shuman also reviewed this material on 6/11/06, 11/13/06, and 11/14/06.  Electronic Spreadsheet.

Another example of an article that appears repeatedly is Bellman.  Bellman was submitted as both exhibits 93 and 101, and was reviewed on numerous occasions, including 11/5/06, 11/7/06, 11/13/06, 11/14/06, 11/16/06, 1/8/07, 1/18/07, 2/9/07, 2/10/07, 2/12/07, and 11/12/07 ("re-analyze").  Id.

A third example is Kimura, which was also filed twice (exhibit 60 and 92), and reviewed on 11/4/06, 11/5/06, 11/7/06, 11/13/06, 11/14/06, 11/16/06, and 2/10/07.  Id.

The 1994 IOM report, Bellman, and Kimura articles are listed repeatedly without any indication of what type of analysis Dr. Shuman is conducting.  It should be noted that (a) these three articles were among the more valuable articles, and (b) that the interruption in the hearing schedule would reasonably require some additional review.  Nevertheless, it is difficult to understand what Dr. Shuman was doing and this lack of information leads to unanswered questions about efficiency and reasonableness.

20

Dr. Shuman averred that he thoroughly reviewed the literature to build "an intellectual database" to support his opinions. Shuman Affidavit at 6, ¶ 45. Considering Dr. Shuman's qualifications and prior participation in the Vaccine Program, it is not reasonable that he spend great amounts of time building a so-called "database." Presley v. Sec'y of Health & Human Servs., No. 98-417V, 2005 WL 6120642 (Fed. Cl. Spec. Mstr. July 12, 2005) (an expert's high number of billed hours was found to indicate that either the billing for time spent acquiring basic information was improper, or that the expert did not have the expertise to testify).

### 3. Administrative Tasks

As noted by the Secretary, Dr. Shuman often charged his full hourly rate for administrative tasks. Resp't's Resp., filed July 16, 2014, at 4, 6. Dr. Shuman performed his own administrative work such as printing, copying, collating, faxing, shipping, retrieving PDF articles, and what appear to be several instances of data entry. See Shuman Invoice, items dated 5/3/06, 6/6/06, 6/11/06, 6/13/06, 11/5/06, 11/13/06, 11/15/06, 11/16/06, 2/12/07, 2/21/07, 11/02/07, and 11/7/07 (this entry appears to include data entry into Excel). On the first page of Dr. Shuman's bill, there are at least ten hours of administrative tasks totaling $3,500.00. Although there may be additional administrative tasks billed at $350.00 per hour during this period, they cannot be confidently identified due to poor task descriptions. Id. at items dated 5/3/06, 6/6/06, 6/11/06, 6/13/06, and 11/05/06.

Later in the course of litigation, Dr. Shuman retained knowledgeable family members to assist with tasks such as retrieving articles. Shuman Affidavit at 4, ¶¶ 29-31. Dr. Shuman included their activities on his invoice and charged a lower hourly rate. See Shuman Invoice, items dated 01/16/07, 02/3/07, and 12/26/07. This practice is more efficient.

Attorneys must charge less for administrative tasks. In fact, activities that are "purely clerical or secretarial tasks should not be billed at a paralegal rate, regardless of who performs them." Missouri v. Jenkins, 491 U.S. 274, 288 n.10 (1989). Attorneys, thus, may not separately charge for clerical or secretarial work because those charges are overhead for which the hourly rate accounts. See Bennett v. Dep't of Navy, 699 F.2d 1140, 1145 n.5 (Fed. Cir. 1983). This same reasoning restricts experts from charging for administrative tasks. See Guy, 38 Fed. Cl. at 407-08 (secretarial work is overhead included in an expert's hourly rate).

21

#### 4.  Petitioners' Counsel's Efforts to Monitor Their Expert

The Lovings argue that the success of their case is owed in large part to Dr. Shuman's long hours of research, which they characterize as "a massive project over six years, with <u>never ending research</u>."  Pet'rs' Resp., filed Nov. 5, 2014, at 7 (emphasis added).  Certainly, Dr. Shuman's efforts were vital in persuading the Court to vacate the undersigned's October 6, 2008 Decision denying compensation.  <u>Opinion and Order</u>, 85 Fed. Cl. at 145-50.

The quality of Dr. Shuman's work is not directly the issue, although there is some correlation between the quality of work and the quantity of hours.  The real question is what is a reasonable amount of time for performing that work?  <u>See</u> <u>Avera</u>, 515 F.3d at 1347-48 (defining lodestar formula).

Due to Congress's restriction that awards of attorneys' fees and costs be limited to "reasonable" amounts (<u>see</u> 42 U.S.C. § 300aa–15(e)), petitioners in the Vaccine Program are not given a "blank check."  <u>Perreira</u>, 27 Fed. Cl. at 34.  To ensure that the expert is working and invoicing reasonably, a petitioner's attorney must monitor the expert.  <u>Perreira</u>, 1992 WL 164436, at *4.

Mr. Dobreff's invoice lists instances when he reviewed Dr. Shuman's bill.  Dobreff Timesheet at 2/27/05, 10/19/05, 6/25/06, 1/3/07, 4/3/07, 1/13/08, and 2/2/08.  The total time for these seven entries is less than two hours.

How Mr. Dobreff assessed Dr. Shuman's billing as he received invoices is not clear.  Regardless, Dr. Shuman's initial invoices contained deficiencies that should have been remedied contemporaneously.  <u>See Caves</u>, 111 Fed. Cl. at 780 (invoices must be contemporaneous and descriptive); <u>Perreira</u>, 1992 WL 164436, at *4.  The most glaring problem was that Dr. Shuman's Feb. 25, 2005 invoice contained charges for which no task was listed.  This omission should have warned Mr. Dobreff that he needed to instruct Dr. Shuman that his invoicing practice was not providing sufficient information.  It appears that this red flag was ignored, as the subsequent June 21, 2006 invoice also contained entries without tasks.[18]

---

[18] Mr. Dobreff was also not fully attentive to court deadlines.  For example, a March 25, 2010 order set May 24, 2010 as the date for the submission of Dr. Shuman's final supplemental

(…continued)

Efforts by Mr. Dobreff to counsel Dr. Shuman about the requirement to create good invoices by, at a minimum, describing the work that is being done could have easily led to a discussion that some of the descriptions that Dr. Shuman had provided were vague and improperly lumped together several activities.  If Mr. Dobreff had provided this advice, and if Dr. Shuman had acted on it, much time and expense could have been saved.

During the pendency of the dispute over Dr. Shuman's invoice, the undersigned took the unusual step of asking the Lovings to correct invoices.  See Savin v. Sec'y of Health & Human Servs., 85 Fed. Cl. 313, 317 ("it is clear that the Special Master had every right to insist upon receiving accurate bills in the first instance and was not obliged to offer petitioners' counsel a second chance to do what he should have done ab initio").  Upon a request for a description for the previously unidentified tasks, Mr. Dobreff cured some problems.

However, other work Mr. Dobreff performed in trying to justify Dr. Shuman's invoice was not helpful.  Mr. Dobreff was asked to correlate articles that Dr. Shuman listed by name of author with the corresponding exhibit number.  Several of these entries are not correct.  For example, for November 3, 2006, Dr. Shuman indicated that he reviewed an article written by Dr. Menkes.  Electronic Spreadsheet.  Mr. Dobreff's corresponding evidence lists exhibits 68 and 101.  Id. Exhibit 68 is the article by Dr. Menkes.  However, exhibit 101 is not.  Exhibit 101 is the Bellman article.

Another example is Dr. Shuman's entry for November 8, 2006, which was "Defense papers; AAN on IS; TC NF re DTaP."  The term "defense papers" suggests that Dr. Shuman reviewed articles submitted and cited by the respondent. The phrase "AAN on IS" is probably an abbreviation for American Academy of Neurology on infantile spasms.  "TC" probably means telephone call with NF (who is not identified) about the vaccine.  For this entry, Mr. Dobreff listed

---

report.  The Lovings missed the deadline without filing a motion for an extension.  By the time the Lovings did file Dr. Shuman's report (December 20, 2010), they had missed two more deadlines without timely motions for extension.

exhibits 105-09, 101, and 107.[19]   Electronic Spreadsheet.  Exhibits 105-09 are actually exhibits that the Lovings submitted, not defense exhibits, and are the package inserts created by vaccine manufacturers.  Exhibit 101 is, again, the Bellman article.  Mr. Dobreff did not identify any article corresponding to "AAN on IS," although that article is probably exhibit 48 (Gerald M. Fenichel, Assessment: Neurologic Risk of Immunization, 52 Neurology 1546 (1999)).

Again, the November 3, 2006 and November 8, 2006 entries are examples where Mr. Dobreff's attempt to explain Dr. Shuman's invoice was either confusing, incomplete, or inaccurate.  Given the magnitude of the fee dispute, more accurate work from Mr. Dobreff would have advanced the Lovings' and Dr. Shuman's claim for reimbursement.

## B. Assessment

The undersigned has divided Dr. Shuman's work into phases and determined how many hours Dr. Shuman is claiming and the value of that claim.  Section I.A. of this decision presents this information.

The undersigned has also reviewed Dr. Shuman's written reports with an eye on the number of pages.  While page length does not correlate automatically to a minimum or a maximum number of hours, the report's size is useful in assessing the reasonableness of the activities.

The undersigned has also considered the articles that Dr. Shuman listed on his invoice and that Mr. Dobreff identified as associated evidence.  The undersigned has looked at the number of substantive pages, the complexity of the articles, and any notations that Dr. Shuman made on the articles.

The undersigned has also gone through the tedious task of reviewing each line in Dr. Shuman's invoice.  The undersigned has focused on entries in which the

---

[19] Mr. Dobreff also indicated that exhibit 107 was discussed on pages 349-52 of the hearing transcript.  Strictly speaking, Dr. Shuman's testimony about the article does not explain his earlier work in reviewing the article.  But, the amount of testimony provides some indirect information about the significance of the article.

Secretary objected to Dr. Shuman's charge.  In the process of identifying disputes, the undersigned concludes that for at least some entries, the Secretary has accepted a generous amount of time that reasonably could have been disputed.  Examples include:

> Entries from 10/2/05 through 10/11/05 (Dr. Shuman invoiced for 15.33 hours for chapters from the IOM reports and the Secretary accepted 8 hours);

> Entry for 7/20/06 (Dr. Shuman invoiced for 9.15 hours for the Swaiman article and the Secretary accepted 4 hours);

> Entries from 9/13/06 through 9/17/06 (Dr. Shuman invoiced for 16.26 hours for his annotation and the Secretary accepted 9 hours);

> Entry for 2/12/07 (Dr. Shuman invoiced for 7.33 hours for reviewing Bellman again, and organizing articles, and the Secretary accepted 3 hours);

> Entry for 8/21/10 (Dr. Shuman invoiced for 11.2 hours for addressing Swaiman and the Secretary accepted 5 hours).

Exhibit X (Secretary's comments on Excel spreadsheet).  This list is not complete, but it should demonstrate that the Secretary's bottom-line number ($149,412.53) is derived from a good-faith assessment.

In my experience, the Secretary's current position is far more reasonable than that staked out by the Lovings.[20]  Throughout the dispute over Dr. Shuman's fees, the Lovings have not demonstrated that they attempted to eliminate remaining unnecessary or unexplained charges.

Nonetheless, based upon my oversight of the case during all important parts of the merits phase, familiarity with the important articles and testimony during the

---

[20] The Secretary's current position, $149,412.53, is 52.5 percent of that requested by the Lovings, but over 80 percent higher than the Secretary's earlier recommendation of $80,000. See Resp't's Br., filed Oct. 17, 2014, at 7.

hearings, supervision of the case on remand during which the parties settled the case, detailed review of the evidence associated with Dr. Shuman's fee, and consideration of the parties' arguments, I conclude that it is reasonable to reduce the fees for Dr. Shuman only by one-third, as opposed to the almost half argued by the Secretary.  This one-third reduction is consistent with the scope of the expert work in this case.  See Saxton, 3 F.3d 1517, 1521 (approving reduction of attorneys' fees by 50 percent due to the special master's experience).  Dr. Shuman's vague billing practices have not persuaded me that more compensation would be reasonable.

I find a reasonable amount of fees for Dr. Shuman is two-thirds of the $282,130.86 requested, or $188,087.22, plus full costs of $1,322.03.  Therefore, the total owed addressing Dr. Shuman's services is $189,409.25.

### C. Comparison to Other Cases

The finding that $189,409.25 constitutes a reasonable amount of compensation is higher than the amounts awarded in cases the parties cited.  These cases are at least somewhat similar in that an expert (a) wrote multiple reports discussing an extensive amount of literature, and (b) testified at a hearing that lasted multiple days.  Relevant cases include the Omnibus Autism Proceeding and the early cases involving the SCN1A gene, such as Stone.[21]

The number of hearing days in Stone (two) is one less than the number of hearing days in the present case (three).  For his work associated with two days of hearing and in preparing four reports, Dr. Kinsbourne received $34,455.00.  Stone, 2010 WL 3790297, at *7-8.  As the Lovings point out, one difference between their case and Stone was that they received compensation and the petitioners in Stone did not.  See Pet'r's Resp., filed Nov. 5, 2014, at 5.  The Lovings seem to imply that Dr. Shuman's extra work (as reflected in a higher number of hours) contributed to the different result.  They warn that a reduction in Dr. Shuman's award would "penalize excellence and being well-prepared."  Id. at 1.

---

[21] In the OAP, Dr. Aposhian may have received an award that exceeded $100,000, as he requested approximately $250,000.  See King, 2009 WL 2252534, at *5 n.9.  But, the OAP may not be the best comparison because of the duration of the hearing.

Cases like <u>King</u> and <u>Stone</u> serve only as ancillary support.  <u>See</u> <u>Broekelschen v. Sec'y of Health & Human Servs.</u>, 102 Fed. Cl. 719, 732 (2011) (finding that special master did not violate lodestar method when looking at comparable cases).  Dr. Kinsbourne's award in <u>Stone</u> does not place a ceiling on Dr. Shuman's compensation here, as Dr. Shuman is receiving more than four times as much compensation.

Dr. Shuman's award is based upon the evidence presented in this case. Unfortunately, the evidence (Dr. Shuman's invoices) was not developed as well as it could have been during the relevant time.  If there is a "lesson" in this case, it is that petitioners' attorneys and experts alike should take the time to describe what work they are doing.  A contemporaneously created invoice that contains sufficient detail and avoids block-billing of multiple hours is much more likely to be credited.

## IV.    Conclusion

The Lovings are awarded $189,409.25 for all costs associated with Dr. Shuman.  This award is in addition to the amount for attorneys' fees and costs awarded on September 10, 2014.  The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

S /Christian J. Moran
Christian J. Moran
Special Master